*E. E. Cooley* for the appellant — *L. Bullis* for the appellee.

---

REYNOLDS v. MEELICK *et al.*

*Appeal from Warren District Court — Saturday, December 17.*

SUFFICIENCY OF EVIDENCE TO WARRANT A DECREE REFORMING A CONTRACT.

THE opinion of a majority of the court was announced by —

LOWE, J. — This is a proceeding in equity to reform the transfer of a certain note and mortgage so as to make the assignment thereof accord with the actual agreement of the parties at the time. The transaction out of which the misunderstanding of the parties arose, was this :

The plaintiff held and owned a note, dated March 8th, 1855, on one J. L. Ewing, for $3,200, running four years, drawing ten per cent interest, payable annually, secured by mortgage on four hundred and thirty acres of land, situated in the neighborhood of four miles from Indianola, in Warren county. The defendant, C. D. Griffith, owned a farm of one hundred and forty acres, situated in the same county,

and a short distance from Indianola. This farm, about the 1st of September, 1856, he sold to plaintiff at $24.00 per acre, and took in payment thereof said note and mortgage, giving his own note for the difference between the amount of the mortgage with the accruing interest, and the price of the farm at the figures just mentioned.

At the consummation of the trade, Griffith deeded to Reynolds the farm referred to, and Reynolds assigned to him the note and mortgage aforesaid. This was some two and a half years before the maturity of the note. Afterwards, upon a foreclosure, the mortgage premises failed to satisfy the debt; and Reynolds is sought to be held liable on his assignment for the residue, by the assignees of C. D. Griffith, who were his relatives; and who brought their suit at law to recover the same. Reynolds denies his liability on the assignment, alleging that at the time the trade was made between him and C. D. Griffith, it was agreed that he, Griffith, should take the note and mortgage upon his own responsibility and without recourse upon him; that the assignment was intended simply to pass the title of the paper without incurring, also, the liability of an indorser, and he brings this suit in equity to reform the assignment aforesaid, and make it conform with the actual agreement and understanding of the parties at the time the trade was made. The defendants deny that such was the contract, and the whole controversy turns upon the existence or non-existence of this simple fact. As bearing upon it, a considerable amount of testimony has been produced on both sides; and we proceed to state the impression which the same has made on the minds of a majority of the court; premising that the plaintiff cannot expect to prevail, unless he shows by a reasonably clear and fair preponderance of evidence the truth of that which he affirms as the ground of the relief which he asks.

Reynolds, the plaintiff, and the defendant, C. D. Griffith, were the contracting parties, and they both testify, the former proving, and the latter denying, the contract sought to be reformed. It is conceded, without more, the plaintiff would have no case. But both parties are more or less supported by other testimony, direct and circumstantial. We will refer first to the testimony of the plaintiff, and that tending to corroborate it, not in all its detailed particulars, but the more prominent and controlling features thereof. During the pendency of the trade, some things transpired which are not without meaning, and serve, in some degree, to throw light upon the point in dispute. It seems that two or three days after something had been said between the parties about the trade, the plaintiff went out to see Griffith's farm; on his return he said to Griffith that he did not like it

very well, and, as he states himself, a Mr. Blair then offered him his farm for sale near town, at $20 per acre.

On looking at his farm, he expressed a willingness to take it at the price named, if he, Blair, would take the Ewing note and mortgage at his own risk. Blair is represented as agreeing to this, provided P. P. Henderson would take it of him in the same way ; but he declined, and this, for the time, broke up the trade. Shortly after this, according to Reynolds' testimony, he had another talk with Griffith, at his store; and he said that he was not afraid to trade for that note, for it was well secured by real estate ; and Reynolds says that they then traded, he agreeing to give $24.00 per acre for the farm, and Griffith was to take the note and mortgage at his own risk. This attempt to trade for the Blair farm, and its failure because Reynolds was unwilling to become personally liable, is not denied or contradicted by any witness; and here an inquiry naturally suggests itself, why Reynolds should render himself personally liable in the purchase of the Griffith farm (which he before said he did not like very well), when he could have got the Blair farm, which he did like, at $4.00 per acre cheaper, by incurring the same liability. This strange conduct of Reynolds is hard to understand or to explain, if Griffith's version of the trade be the true one. But the trade is made, and the parties go to P. P. Henderson, the county judge, to have their papers fixed up and exchanged. Reynolds' version of what passed there, is this, in substance : A deed for the Griffith farm was made out by Henderson, the county judge, duly executed, and handed, in connection with a note of $220.00, to him, the said Reynolds, who passed over the Ewing note and mortgage, in return, to the said Griffith. After looking at the same, Griffith said, "You had better sign them over." Reynolds refused, saying that he was not to be responsible for the note. Griffith replied, he did not want him to sign as indorser, but that if there had to be a suit to foreclose, he wanted to sue in his own name. Reynolds says that he then stated over the contract, in the presence of both Henderson and Griffith, and the latter made no objection. But Henderson said, if that is the contract, it will not be changed by signing over the note and mortgage; it will enable Griffith to foreclose in his own name, without troubling him, the said Reynolds; and thereupon he told Henderson to make out the transfer, and he would sign the same.

The substance of Griffith's version of the trade, and what transpired before the county judge, is this : That an agreement to sell the land, on the one hand, and to pay with the Ewing note and mortgage on the other, was entered into, but that Reynolds agreed to indorse the note and mortgage aforesaid, saying that he would not trade in paper

or notes that he was afraid to indorse. That afterward, when they appeared before Henderson to exchange papers, and his deed to Reynolds was duly executed and ready for delivery, he, Reynolds, laid his note on the table, requesting Judge Henderson to write an assignment from himself to Griffith; which was done, and he signed it. The mortgage was not then present, but Reynolds said he would bring it up after dinner, which he did. The question then arose, whether it was also necessary to assign the mortgage. Henderson observed that it would not change the relations of said Reynolds to the note, and it would give Griffith the power to collect in his own name. Reynolds then handed the mortgage to the judge to write the assignment, which he afterward signed, having made no objection to the indorsement of either paper.

The testimony of these two witnesses is too contradictory to be reconciled, and we must look to the other evidence in the case, of which there is a large amount, to see who is best supported. Of course we shall attempt no general review or criticism of the same, but only some of the more prominent facts and circumstances which have conducted the minds of a majority of the court to the conclusion that will be announced.

*First*, in regard to Judge Henderson's testimony, who was in a position to know far more of the transaction than any other witness, besides the parties themselves.

He says the parties did come before him to complete their trade and exchange their papers, and that no one else was present, that he can remember of. He does not recollect the particulars of the trade, but that he wrote the assignment, and remembers that when he presented the assignment of the note or mortgage (he would not be certain which) to Mr. Reynolds to sign, he objected to signing it, stating that he did not want to get into any trouble. The witness says, he stated to him that in signing the same he would not change his relation on the note, and that it would be necessary for him to sign it so that Mr. Griffith could foreclose the mortgage in his own name. Does not remember that Griffith said anything at the time in relation to how he was to take the note and mortgage, but thinks he did say that the security was good and the land was worth the money, and that his impressions, from the conversation that occurred, were, that Reynolds was not to be responsible for the note and mortgage. In answer to the question what he meant by the expression "*change his relation*" he says he simply meant, that he would be just as liable without signing, as with, and he further says that he does not recollect that Griffith made any reply or objection to the above explanation as he made it to Reynolds

at the time. Now this testimony of Judge Henderson certainly tends to corroborate Reynold's statement of the contract, and that he did, contrary to Griffith's testimony, object to assigning the note and mortgage, lest he should get into trouble, meaning thereby, without doubt, that *he might be held liable;* for to remove his scruples in this particular, Henderson says he told him, that by doing so he would not change his relation on the note, meaning thereby, as he afterward explained, that he would be just as liable *without signing* as *with.* But that it was necessary to assign the instruments in order that Griffith might sue on them in his own name; and being thus assured, Reynolds made the assignments in question. Not expecting thereby to render himself liable, but according to his own testimony, and that of Judge Henderson, he did so to pass the title simply that Griffith might sue in his own name. And it is no light circumstance in this transaction that when Henderson was persuading Reynolds, against his protest, to assign the note, telling him in effect that he would not thereby become legally liable, that Griffith made no objection, and said nothing to the contrary, but did remark as Henderson says, that he thought the security good and the land worth the money. Now if the contract between the parties was that Reynolds should indorse the paper and was to incur thereby the responsibilities of an ordinary indorser, we do not see how he could listen to what passed between Henderson and Reynolds about the assignment of the paper, the object thereof, and the non-liability of Reynolds, without protesting and insisting that the very object of the assignment was to render the said Reynolds a conditional surety of the debt. Yet, Henderson testifies that he said nothing to the contrary, and that he got the impression from the conversation between the parties that Griffith was to take the note and mortgage at his own risk. It is difficult for us to conceive how Henderson should have got any such impression upon the Griffith theory of what transpired before him, because according to his statement, Reynolds objected to nothing, assigned the instruments without hesitation, and that there was no controversy between them at that time, as to what the contract was. It is singular, in the absence of anything to produce the impression that Henderson should have got the idea, that the understanding between the parties, and also with himself, that Griffith was to take the paper at his own risk, and that the assignments were made to pass the title only, and to give Griffith the power to sue in his own name, and both he and Reynolds are to some extent confirmed in their version of the transaction by the character of the assignments. That upon the note reads as follows:

"For value received I hereby sell and assign all my right and interest to the within note, unto C. D. Griffith.

(Signed)           JOHN REYNOLDS."

That upon the mortgage as follows:

"I hereby sell and assign all my right and title to the within mortgage, to C. D. Griffith, and authorize him to foreclose the same, if it becomes necessary, in his own name.

JOHN REYNOLDS."

Such transfer, if it was land, instead of choses in action, would admit of no recourse upon the assignor. But they are unusual upon negotiable paper, nevertheless they harmonize with Reynolds' representation of what the contract was, and Henderson's idea of what was necessary to transfer the title without incurring the liability of an indorser. There are several other circumstances developed in the evidence, indirectly corroborating Reynolds in his statement that Griffith was to take a transfer of the note and mortgage without recourse, but we will only mention one more to which we attach considerable weight. We refer to the fact that the evidence shows that the mortgage premises, four hundred and thirty acres, was worth from $500.00 to $1,000.00 more than the land which Reynolds got of Griffith, furnishing a very plausible reason why Griffith should take the claim on Ewing without recourse; and yet, although the defendants have foreclosed said mortgage, and become fully invested with the title to the four hundred and thirty acres, which we cannot but think is still worth no inconsiderable amount more than the one hundred and forty acres which Reynolds got of Griffith, still, nevertheless, they are seeking to recover some $1,400.00 or more of plaintiff on his indorsements aforesaid. We cannot repress the conviction, from all the circumstances of the case, that said indorsements are against the real contract of the parties, and should therefore be reformed. We are not unaware that there are some circumstances testified to, corroborating the defendant Griffith in some particulars, but they are more apparent than real, and susceptible in most part to an explanation that makes them not inconsistent with the conclusion at which we have arrived.

A majority of the court are of the opinion that there is a preponderance of evidence in favor of the plaintiff, and that he should have a decree responsive to the prayer of his bill, and to that end the judgment will be reversed and the cause remanded.

Reversed.

WRIGHT, Ch. J., *dissenting*. — I regret that I feel compelled to differ with the majority of the court in the opinion just announced. And I use the expressive meaning just which it imports. Upon legal ques-

tions it is but right that we should adhere to our individual convictions with tenacity, yielding only when satisfied of what the law is, and that those differing with us have arrived at its true exposition. In a case involving alone questions of fact, however, so many matters enter into their solution, so differently will the same testimony impress different minds, that we must, and should naturally yield our several impressions, arriving in this method, as a general rule, more nearly at the exact truth in the premises. And, hence, unless thoroughly, fully and entirely satisfied of the correctness of my own construction of the entire evidence in a case, I deem it a duty to defer, after a full discussion of all its bearings, to the views of a majority, having equal means of judging with myself. In this case I am thoroughly, fully, and entirely satisfied that the testimony does not sustain plaintiff's case, and, therefore, while I regret the necessity, I feel compelled to express my dissent.

It is not my purpose to refer to this testimony at length. Its full and great weight, character and purport, could not be appreciated without setting it out as it is written. To state the construction which, in my opinion, it ought to receive, would, after all, aid but little in conveying to the minds of those not conversant with it, a full view of what the record really contains. To know just what it contains, and what the witnesses swear, their testimony should be read. I can only say, that I feel the utmost confidence in the assertion that it fails entirely to make a case entitling the plaintiff to the relief sought. When I add the further remark, that as I read the record, as the testimony impresses me, there is scarcely a single circumstance corroborating the testimony of the plaintiff himself, while all the circumstances are entirely reconcilable with the theory of the defendants, and that plaintiff's admissions, promises and proposals, long after the contract was made, are utterly inconsistent with the claim which he now makes; and recur to "the difficulty of the task" which he has undertaken, and the "strictness of proof" required, I am constrained to the conclusion that this bill should be dismissed.

Of course, there can be no question but that plaintiff is liable upon the face of the indorsement of the note, nor in my opinion, can it well be claimed that plaintiff did not actually sign the indorsements, knowing just what they contained. He may have had (and this is the most that, in my opinion, can, upon any fair ground, be claimed) the impression that such writing only imposed a certain legal liability. This is no excuse to him, however. This affords no ground for reforming the contract, and making it speak a different language from what the parties finally agreed upon. But this rule of law aside, and look-

ing at the case rather from a fact stand point alone, I am not at liberty to forget that "the writing ought to be accepted as a full, a correct expression of the contract of the parties, until the contrary is established beyond reasonable controversy," "that those who undertake to rectify or reform a written contract, by showing a mistake, undertake a task of great difficulty;" "that the cases all concur in the strictness and difficulty of the proof;" "that if the proofs are doubtful and unsatisfactory, and the mistake is not made entirely plain, equity will withhold relief;" "that it is not sufficient that there may be reason to presume a mistake;" "that the testimony ought to be clear, decisive and unequivocal;" "that if now and then through carelessness and inattention, an instrument formally drawn up and executed, fail of expressing the true intent of the parties in their bargain, it were better that they should suffer than that a system should be adopted, the natural tendency and sure consequences of which would be to increase uncertainty, multiply instances of negligence, and hold out lures to false testimony." And when I remember that the opinion just announced, while not denying these rules, "casts" them in their mildest form, it almost necessarily follows that we should reach a different result. My own convictions are strong, and it may be radical almost upon the rules of law governing such a controversy, and, as according to my view of the testimony, plaintiff's case is far from being sustained, of course I have no difficulty in saying that the judgment below should be affirmed.

*J. S. Polk* for the appellant— *C. C. Nourse* and *H. W. Maxwell* for the appellee.